The PEOPLE of the State of Colorado, ex rel. Dale TOOLEY, District Attorney, Plaintiff-Appellee,

v.

SEVEN THIRTY–FIVE EAST COLFAX, INC., a Colorado corporation, d/b/a Kitty's Pleasure Palace, Defendant-Appellant.

The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Gordon MIZELL, Lloyd Leatherwood, Mark Lange, Mitchell Kelloff, Louis Lawver, Douglas McClure, Marquis Ford, Modern Books of Colorado, Inc., Patty Deighton and Darrell Deighton, Defendants-Appellees.

ADULT LITERARY GUILD, INC., a Colorado corporation, d/b/a Washington Bookstore; Adult Literary Guild, Inc., a Colorado corporation, d/b/a Katy's House of Pleasure; Santana Sales, Inc., a Colorado corporation, d/b/a Adult World; Record Land Co., Inc., a Colorado corporation, d/b/a Friends and Lovers Motel; Cliff Story, d/b/a Courtesy Motel, Plaintiffs-Appellees,

v.

Paul Q. BEACOM, in his official capacity as District Attorney for the County of Adams; Bert Johnson, in his official capacity as Sheriff for the County of Adams; Ben Blake, in his official capacity as Chief of Police for the City of Aurora, Defendants-Appellants.

Nos. 82SA212, 83SA83 and 83SA99.

Supreme Court of Colorado, En Banc.

Feb. 25, 1985.

Rehearing Denied April 15, 1985.

Norman S. Early, Jr., Dist. Atty., Michael Kane, Deputy Dist. Atty., Denver, for plaintiff-appellee.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Irvin Borenstein, Denver, for defendant-appellant.

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., John Milton Hutchins, Asst. Atty. Gen., Denver, for amicus curiae, Colorado Atty. Gen.

Robert L. Russel, Dist. Atty., Daniel C. Zook, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Irvin Borenstein, Denver, for defendants-appellees.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Denver, for plaintiffs-appellees.

Christian M. Lind, Asst. City Atty., Brighton, Claybourne M. Douglas, Asst. City Atty., Aurora, Steven L. Bernard, Chief Trial Deputy, Brighton, for defendants-appellants.

NEIGHBORS, Justice.

■ These appeals concern the constitutionality of the Colorado obscenity statutes (the Act), sections 18–7–101 to –105, 8 C.R.S. (1984 Supp.).[1] Although each of the three cases arises from a distinct fact pattern and in a different procedural posture, we have elected to consolidate them for one opinion because each appeal involves challenges to the validity of the Act based upon the first amendment to the United States Constitution,[2] article II, section 10 of the Colorado Constitution,[3] and the due process clauses of each constitution.[4] We hold that the word "accredited" used in section 18–7–104 is unconstitutionally vague because it is undefined and that the definition of "patently offensive" in section 18–7–101(4) is unconstitutionally overbroad because those words are defined in terms of community standards of decency. We also conclude that the presumption of knowledge contained in section 18–7–102(3) violates due process requirements and that the statutory scheme proscribing "obscene devices" impermissibly burdens the right of privacy. We reject the other attacks on the statutes, find that the offending provisions are severable and uphold the remainder of the Act.

I.

In *People v. Seven Thirty-Five East Colfax, Inc.*, the People instituted a civil action for injunctive relief seeking to have certain items declared obscene pursuant to section 18–7–103, 8 C.R.S. (1984 Supp.). The defendant, Seven Thirty-Five East Colfax, Inc.,[5] filed an answer in which it alleged that the Act is unconstitutional on numerous grounds, both facially and as applied.[6]

1. The full text of the Act which was in effect when these cases were filed in the district courts is found in the 1981 Session Laws of Colorado at chapter 223 beginning on page 998. With three exceptions, not material here, the statutes contained in the 1984 supplement to 1978 Replacement Volume 8 are identical to the Act adopted in 1981. A revisor's bill enacted by the General Assembly in 1983 amended the word "prescribed" to "proscribed" in sections 18–7–102(5) and (6). Ch. 511, sec. 4, § 18–7–102, 1983 Colo.Sess.Laws 2047, 2048. In addition, section 18–7–106, requiring expedited resolution of constitutional challenges, was repealed by its own terms on January 1, 1983. Ch. 223, sec. 1, § 18–7–106, 1981 Colo.Sess.Laws 998, 1002. The 1981 Act is attached as Appendix A.

2. The first amendment guarantee that "Congress shall make no law ... abridging the freedom of speech," is applicable to the states under the fourteenth amendment. *E.g., Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

3. Colo. Const. art. II, § 10, provides:

*Freedom of speech and press.* No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.

4. U.S. Const. amend. XIV; Colo. Const. art. II, § 25.

5. The defendant operates a retail store known as Kitty's Pleasure Palace and Kitty's Bookstore at 727–735 East Colfax in Denver.

6. The defendant challenged the Act on the following constitutional grounds: (1) Section 18–7–101(2)(b)(II) defining "obscene" fails to meet part (b) of the *Miller* test. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). (2) The words "prurient interest" in section 18–7–101(2)(a), "patently offensive" in section 18–7–101(2)(b), and "accredited" in section 18–7–104(1)(a) and (b) are vague. (3) The

For purposes of the case, the parties stipulated that the items would be obscene if the Act is constitutional. The trial court found the word "accredited" contained in section 18–7–104, 8 C.R.S. (1984 Supp.), to be unconstitutionally vague.[7] The court upheld the remaining provisions in the Act and denied the defendant's request to dismiss the complaint. The defendant appealed after its motion for a new trial was also denied. However, the People have not cross-appealed the trial court's determination that the word "accredited" as used in the Act is unconstitutionally vague.[8]

In *People v. Mizell*, ten defendants were separately charged with promotion and possession with intent to promote obscene materials and obscene devices in violation of section 18–7–102(2)(a)(I) of the Act. The cases were consolidated in the district court. Each defendant filed a motion to dismiss in which it was claimed that the Act was unconstitutional on grounds similar to those alleged in *Seven Thirty-Five East Colfax, Inc.* The trial court held that the entire Act was invalid because four provisions were constitutionally infirm: the

definition of "patently offensive," the definition of "promote," the presumptions found in section 18–7–102(3) and (4), 8 C.R.S. (1984 Supp.), and the term "accredited." However, the trial court did not dismiss the charges against the defendants; rather, it stayed the effect of its ruling to allow the People to appeal to this court.

In *Adult Literary Guild v. Beacom*, the plaintiffs, Adult Literary Guild, et al., sought a preliminary and permanent injunction against the enforcement of the Act by the district attorney and certain police agencies in Adams County. After several hearings, the trial court entered its final order ruling that the plaintiffs had standing to challenge the Act and declaring the Act unconstitutional. The court found that the "accredited" exception was vague and violated equal protection guarantees and that the prohibition against the promotion of obscene devices violated the right to privacy. The court also held the words and phrases enumerated in section VII of this opinion unconstitutional. The trial court permanently enjoined the enforcement of the Act.

---

words "material" in section 18–7–101(1), "promote" in section 18–7–101(6), and "resale" in section 18–7–101(8) are overbroad. (4) The culpable mental state or "scienter" requirements in section 18–7–102 permit the conviction of a person who innocently, unknowingly, and unintentionally disseminates obscene material, and are, therefore, overbroad. (5) The definition of "obscene device" in section 18–7–101(3) and the provisions proscribing their possession and promotion in section 18–7–102(3) and (4) are invalid. (6) The injunctive provisions in section 18–7–103 impermissibly authorize the prior restraint of free speech. (7) The "accredited" exemption denies the defendant equal protection of the law.

**7.** In its written ruling on the "accredited" issue, the trial court stated:

This term is not defined within the act. Although this term is frequently mentioned in conjunction with "schools" it is not a common, or even appropriate term in connection with museums, libraries and theaters. Since an accredited museum, library, school or theater is immune from the provisions of this act, "it is of paramount importance to know if, in fact, it is accredited."

The Court finds that this part of the act is unconstitutionally vague. The act however,

includes a severability provision, 18–7–105. The Court finds that this part of the law is not so essential and inseparably [sic] connected with, and dependent upon, this voided part that it cannot be presumed that the general assembly would have enacted the law without the voided provision, and the Court finds that the valid provisions standing alone are complete and capable of being executed in accordance with legislative intent. The excising [sic] of this part of the statute also does not constitute in any way the wholesale rewriting of the statute which the supreme court eschewed in Tabron I.

We are unable to determine whether the trial court intended to sever all of section 18–7–104 from the Act or to excise only the word "accredited" from subsections (a) and (b) of that section. The People claim that only the term "accredited" was stricken from the statute while the defendant argues that the entire section was severed. In view of our ultimate disposition of this case, we need not decide which interpretation of the court's ruling is accurate.

**8.** The Office of the Denver District Attorney entered its appearance on behalf of the People as the appellee in this case. The attorney general was granted leave to appear as amicus curiae. The attorney general has asserted that the word "accredited" is not unconstitutionally vague.

## II.

We are once again requested to pass upon the constitutionality of statutes regulating obscenity, sections 18–7–101 to –105, 8 C.R.S. (1984 Supp.). The majority of these provisions were enacted by the legislature in 1981, and represent the General Assembly's latest effort to control obscenity. Ch. 223, sec. 1, §§ 18–7–101 to –105, 1981 Colo.Sess.Laws 998–1002. *See also, supra* note 1. Earlier statutory enactments were declared unconstitutional by this court in *People v. New Horizons, Inc.,* 200 Colo. 377, 616 P.2d 106 (1980), and *People v. Tabron,* 190 Colo. 149, 544 P.2d 372 (1976).[9] We appreciate, as Justice Harlan noted, that obscenity is an intractable problem. *Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 704, 88 S.Ct. 1298, 1313, 20 L.Ed.2d 225 (1968) (Harlan, J., concurring and dissenting). Moreover, we recognize the frustration experienced by the General Assembly in discharging the difficult task of "trying to define what may be indefinable." *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). That these observations are accurate is amply demonstrated by the diverse reasons given by the respective district judges for declaring all or part of the present statutory scheme unconstitutional as a result of the broad-based attack on the Act. Before addressing the merits of the vagueness, overbreadth, and due process issues, it is necessary to briefly consider the question of standing and the general principles governing obscenity legislation.

## A.

The question of standing is raised only in *Adult Literary Guild.* In their amended complaint, the plaintiffs alleged that their businesses sell materials that are "sexually explicit in nature and depict various physical displays of the anatomy and sexual conduct which conceivably come under the purview of the statute challenged herein

because of their graphic nature." The government officials, who are the defendants-appellants, characterize this allegation as a concession that the plaintiffs' materials are obscene.[10] The officials conclude that since obscene materials are not protected by the constitutional guarantees of free speech, the plaintiffs lack standing to attack the Act on "facial overbreadth or vagueness grounds since the materials they purvey clearly fall within the statutory proscriptions."

As a general rule, questions of standing present a two-pronged inquiry: (1) Whether the plaintiff has suffered actual injury from the challenged government action; and (2) whether the injury is to a legally protected or cognizable interest. *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977). Beginning with *Bolles v. People,* 189 Colo. 394, 541 P.2d 80 (1975), however, we recognized that the limitations on third party standing have been substantially relaxed in the context of first amendment claims. We stated:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. Not so, however, where, as here, we are dealing with First Amendment protections. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908 [2914], 37 L.Ed.2d 830 [ (1973) ]; *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 [ (1975) ].

In *Broadrick, supra,* the Court noted that in statutes seeking to regulate only speech or written words, claims of facial overbreadth should be entertained as an exception to the general rule. This is because "the possible harm to society in permitting some unprotected speech to

---

9. *See* Richardson, *Obscenity Law in Colorado: The Struggle to Pass a Constitutional Statute,* 60 Den.L.J. 49 (1982).

10. The standing issue as it relates to "obscene devices" is resolved in section VII.A., *infra.*

go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Id.* 413 U.S. at 612; *Bigelow v. Virginia, supra.*

*Bolles,* 189 Colo. at 396, 541 P.2d at 82. Our most succinct pronouncement on the issue of third party standing and overbreadth is found in *City of Englewood v. Hammes,* 671 P.2d 947, 950 (Colo.1983), where we said:

> In First Amendment cases, however, the rules of standing are broadened to permit a party to assert the facial overbreadth of statutes or ordinances which may chill the constitutionally protected expression of third parties, regardless of whether the statute or ordinance could be applied constitutionally to the conduct of the party before the court. *May v. People,* 636 P.2d 672, 675 (Colo.1981); *Marco Lounge, Inc. v. City of Federal Heights, supra* [625 P.2d 982], at 985 [ (Colo.1981) ]. Where a statute purports to regulate conduct, rather than pure speech, however, the facial overbreadth exception to traditional rules of standing will be applied only when the overbreadth is real and substantial "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973); *May v. People, supra,* at 676. Moreover, facial overbreadth rarely will be found when a statute is susceptible to a suitably limiting construction. *May v. People, supra,* at 675–76; *Marco Lounge, Inc. v. City of Federal Heights, supra,* at 986.

In the context of first amendment claims where, as here, the challenged provision arguably infringes upon "a substantial amount of constitutionally protected conduct," we may apply the overbreadth standing analysis to the vagueness challenges as well. *City of Englewood v. Hammes,* 671 P.2d at 951 (citing *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983)). *See also High Gear & Toke Shop v. Beacom,* 689 P.2d 624 (Colo.1984); *State Board for Community Colleges v. Olson,* 687 P.2d 429 (Colo.1984). We conclude, therefore, that the plaintiffs have standing to attack the Act on the ground of vagueness, *Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); *City of Englewood v. Hammes,* 671 P.2d 947 (Colo.1983), and standing to assert the unconstitutionality of the Act on the ground of overbreadth. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982 (Colo.1981).[11]

### B.

■ Article II, section 10 of the Colorado Constitution provides broader protection for freedom of speech than does the first amendment to the United States Constitution. *People v. Berger,* 185 Colo. 85, 521 P.2d 1244 (1974); *In re Canon 35,* 132 Colo. 591, 296 P.2d 465 (1955). Therefore, obscenity statutes must be drafted so that they are compatible with the United States and Colorado Constitutions as interpreted by the Supreme Court and this court, respectively. *People v. New Horizons, Inc.,* 200 Colo. 377, 616 P.2d 106 (1980). Moreover, to avoid being declared invalid on grounds of vagueness, such statutes must meet the requirement of specificity necessary to apprise a person of what conduct may be subject to criminal penalties. Nor may such statutes violate the constitutional proscription against overbreadth by chilling the exercise of protected speech. *Tabron,* 190 Colo. at 151, 544 P.2d at 374.

**11.** The defendants' reliance on *People v. Weeks,* 197 Colo. 175, 591 P.2d 91 (1979), and *People v. Bridges,* 620 P.2d 1 (Colo.1980), is misplaced. In *Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982, 986 n. 5 (Colo.1981), we recognized that the court's formulations of the rule limiting third party standing in *Weeks* and *Bridges* may not be fully consistent with the holdings in *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), and *Bolles v. People,* 189 Colo. 394, 541 P.2d 80 (1975).

### III.

■ The parties challenging the Act contend that the exemption provisions in the statute are invalid because the word "accredited" is unconstitutionally vague.[12] Section 18–7–104, 8 C.R.S. (1984 Supp.), provides:

> *Applicability of this part 1.* (1) Nothing contained in this part 1 shall be construed to apply to:
>
> (a) The possession, purchase, distribution, exhibition, or loan of any work of art, book, magazine, or other printed or manuscript material by any *accredited* museum, library, school, or institution of higher education;
>
> (b) The exhibition or performance of any play, drama, tableau, or motion picture by any *accredited* theater, museum, library, school, or institution of higher education.

(Emphasis added.)

Nowhere in the Act is the term "accredited" defined. In this context it is not possible to ascertain what the legislature intended by its use of that term. At the very least, the word "accredited" implies the existence of reasonably fixed and certain standards with which the enumerated facilities must comply in order to reach the status of being "accredited." However, since the term "accredited" is not defined, there are no prescribed standards that a museum, library, school, or institution of higher learning must possess in order to come within the purview of the exception. Indeed, it could be argued that any "li-

brary" or "museum" which exclusively loaned or displayed items of an obscene nature fits within the exceptions.

In *City of Englewood v. Hammes,* 671 P.2d 947, 951 (Colo.1983), we summarized the applicable standard when a statute or ordinance is claimed to be vague. We stated:

> The essence of a vagueness challenge is that the law "fails to reasonably forewarn persons of ordinary intelligence of what is prohibited ... and lends itself to arbitrary and discriminatory enforcement because it fails to provide explicit standards for those who apply it." *City of Lakewood v. Colfax Unlimited,* 634 P.2d 52, 59 (Colo.1981); *People in the Interest of C.M.,* 630 P.2d 593, 594–95 (Colo.1981). A vague law does not provide courts and juries "adequate standards to enable them to apply the law consistently and in accord with legislative intent." *People v. Smith,* 638 P.2d 1, 3 (Colo.1981).

Absent standards or a definition for "accredited," section 18–7–104, 8 C.R.S. (1984 Supp.), creates a danger of arbitrary enforcement by "allowing the exercise of unbridled discretion by the police, judge, and jury." *People v. Beruman,* 638 P.2d 789, 793 (Colo.1982).

In applying these standards to section 18–7–104, we conclude that the word "accredited" is so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application.[13] *Connally v. General Construction*

---

**12.** At least three state supreme courts have found exceptions to obscenity statutes unconstitutional. The exemption from criminal penalties under the Tennessee Act to "natural persons acting as agents of a non-taxable entity" was voided on vagueness and due process grounds in *Leech v. American Booksellers Association, Inc.,* 582 S.W.2d 738 (Tenn.1979). An exception granted tax exempt organizations which are supported by tax funds or receive at least one-third of their support from publicly donated funds was found to violate equal protection principles in *City of Duluth v. Sarette,* 283 N.W.2d 533 (Minn.1979). The Maryland obscenity law was declared unconstitutional on equal protection grounds because it excepted employees of motion picture theaters but not employees of bookstores from criminal prosecu-

tion for exhibiting obscene materials. *Wheeler v. Maryland,* 281 Md. 593, 380 A.2d 1052 (1977).

**13.** The following discussion during the hearing on the Act held by the House State Affairs Committee demonstrates some legislators' recognition of the ambiguity and lack of clarity with regard to the word "accredited." Unfortunately, however, the problem was not resolved. The participants to the discussion were Representative James Lee, Robert Miller (then Weld County District Attorney and a drafter of the legislation), and Senator Ted Strickland, one of the senate sponsors of S.B. 38 which later became the Act. Ch. 223, sec. 1, §§ 18–7–101 to –105, 1981 Colo.Sess.Laws 998–1002.

> Q. (By Lee) What's the definition of an accredited theater?

Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *People ex rel. City of Arvada v. Nissen,* 650 P.2d 547 (Colo.1982). The word "accredited" is vague and thereby violates the due process guarantees of the fourteenth amendment to the United States Constitution and article II, section 25 of the Colorado Constitution.

## IV.

■■■ We next address the overbreadth issue concerning the definition of "patently offensive." In *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court prescribed the following test to be used in determining if material or conduct is obscene and therefore not entitled to protection under the first amendment:

(a) [W]hether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615. In applying the *Miller* standard to Colorado obscen-

ity statutes, this court has twice declared state obscenity provisions unconstitutional. *People v. New Horizons, Inc.,* 616 P.2d 106 (Colo.1980); *People v. Tabron,* 190 Colo. 149, 544 P.2d 372 (1976). In response, the legislature adopted Senate Bill 38 in 1981. Ch. 223, sec. 1, §§ 18–7–101 to –105, 1981 Colo.Sess.Laws 998–1002. Section 18–7–102, 8 C.R.S. (1984 Supp.), defines the offenses of promotion and wholesale promotion of obscenity.

*Obscenity.* (1)(a) A person commits wholesale promotion of obscenity if, knowing its content and character, he wholesale promotes or possesses with intent to wholesale promote any obscene material or obscene device.

(b) Wholesale promotion of obscenity is a class 1 misdemeanor.

(2)(a) A person commits promotion of obscenity if, knowing its content and character, he:

(I) Promotes or possesses with intent to promote any obscene material or obscene device; or

(II) Produces, presents, or directs an obscene performance or participates in a portion thereof that is obscene or that contributes to its obscenity.

(b) Promotion of obscenity is a class 2 misdemeanor.

A. (By Miller) Pardon?
Q. An accredited theater? What is that?
A. I do not know what an accredited theater is.
Q. How would one know which theater— place of showing—was accredited or not?
A. I don't know the answer to that.
Q. (By Lee) Ted, do you want to answer that?
A. (By Strickland) That word was carefully chosen because of the reference to institutions of higher education and the artistic material that is used and displayed at those institutions. An institution is accredited—the theaters there are part of that institution—are part of the accreditation process and that's why that word was selected.
. . . .
Q. (By Lee) Ted, you say that the theater must be contained within the institution?
A. (By Strickland) No. But the question arose in our committee meeting as to whether or not the legitimate bookseller, the legitimate artistic or literary material, by the exemption

of the libraries and those kind of things, extended to the theater at those institutions. And so, what we were talking about theaters in that setting, that's the reason why that was included.
Q. You're not talking about commercial theaters?
A. No sir.
. . . .
The only other evidence available from the hearing before the House State Affairs Committee is this statement by Senator Strickland:
We further provide for the exemption of public libraries, libraries in public institutions, and other kinds of libraries. We also exempt the provisions of any kind of medical journals any kind of literary or artistic publications. So the allegations that have been alleged to this bill saying that we're trying to tell people what they can do or can't do in the confines of their own home or in libraries, or in works of art or those kinds of things are totally untrue.

(3) A person who promotes or wholesale promotes obscene material or an obscene device or possesses the same with intent to promote or wholesale promote it in the course of his business is presumed to do so with knowledge of its content and character.

(4) A person who possesses six or more identical obscene devices or six or more identical obscene materials is presumed to possess them with intent to promote the same.

(5) This section does not apply to a person who possesses or distributes obscene material or obscene devices or participates in conduct otherwise proscribed by this section when the possession, participation, or conduct occurs in the course of law enforcement activities.

(6) This section does not apply to a person's conduct otherwise proscribed by this section which occurs in that person's residence as long as that person does not engage in the wholesale promotion or promotion of obscene material in his residence.

Section 18–7–103, 8 C.R.S. (1984 Supp.), provides for injunctive relief against the wholesale promotion or display of obscene materials and obscene devices. The critical term in both sections is "obscene," which is defined in section 18–7–101(2), 8 C.R.S. (1984 Supp.), as follows:

(2) "Obscene" means material or a performance that:

(a) The average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(b) Depicts or describes:

(I) *Patently offensive* representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(II) *Patently offensive* representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or device designed and marketed as useful primarily for stimulation of the human genital organs; and

(c) Taken as a whole, lacks serious literary, artistic, political, or scientific value.

(Emphasis added.) "Patently offensive" is defined in section 18–7–101(4), 8 C.R.S. (1984 Supp.), as "so offensive on its face as to affront current community standards of *decency.*" (Emphasis added.)

Although the Act adopts the *Miller* test almost verbatim, it defines "patently offensive" in terms of standards of "decency." The parties challenging the validity of the Act contend that the definition of "patently offensive" is an integral part of the definition of obscene and that "decency" is an overly broad standard by which to measure whether material is obscene. Thus, the issue presented is whether the assessment of material as "patently offensive" may constitutionally be made against a community standard of decency under the United States and Colorado Constitutions.[14]

**14.** In this case it is unnecessary for us to decide if the words "patently offensive" must be defined in an obscenity statute or authoritatively construed by the courts. Our analysis of the Supreme Court's decisions does not yield a definitive answer to the question of whether the Court has imposed such a requirement. In *Jenkins v. Georgia,* 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974), the Court stated:

Even though questions of appeal to the "prurient interest" or of patent offensiveness are "essentially questions of fact," it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is "patently offensive." Not only did

we there say that "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary," 413 U.S., at 25 [93 S.Ct., at 2615], but we made it plain that under that holding "no one will be subject to prosecution for the sale or exposure of obscene materials unless these matters depict or describe patently offensive 'hard core' sexual conduct...." *Id.* at 27 [93 S.Ct., at 2616]. Later, in *Smith v. United States,* 431 U.S. 291, 301, 97 S.Ct. 1756, 1764, 52 L.Ed.2d 324 (1977), the Court stated:

The Supreme Court has never directly addressed the issue of whether material or a performance alleged to be patently offensive is to be judged against a community standard of decency or of tolerance. In *Miller*, the Supreme Court spoke of "community standards" with no further elaboration. However, the Court stated: "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found *tolerable* in Las Vegas, or New York City." 413 U.S. at 32, 93 S.Ct. at 2619 (emphasis added and footnote omitted). In *Smith v. United States*, 431 U.S. 291, 305, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977), the Court held that "contemporary community standards must be applied by juries in accordance with their own understanding of the *tolerance* of the average person in their community...." (Emphasis added.) Finally, in *New York v. Ferber*, 458 U.S. 747, 761 n. 12, 102 S.Ct. 3348, 3357 n. 12, 73 L.Ed.2d 1113 (1982), the Court observed: "It would be equally unrealistic to equate a community's *toleration* for sexually oriented material with the permissible scope of legislation aimed at protecting children from sexual exploitation." The fact that the Court has consistently used the word "tolerance" is a fact of critical importance to our analysis.

Moreover, the distinction between "decency" and "tolerance" is a difference of constitutional significance. Decency is defined as "suitability or fitness to circumstances ... whatever is proper or becoming: standards of propriety." *Webster's*

*Third New International Dictionary* 584 (1969). Tolerance, on the other hand, is defined as "a permissive or liberal attitude toward beliefs or practices differing from or conflicting with one's own: sympathy or indulgence for diversity in thought or conduct." *Id.* at 2505. A question asked of the district attorney by the trial judge in *Mizell* cogently summarizes the distinction between the two words: "Why isn't decency what we would prefer, what we would like, while tolerance is what we are willing to put up with, even though we may not like it?"

◼◼◼ The "tolerance" versus "decency" controversy has been considered by a number of other courts. The majority have concluded that a standard of "decency" or "indecency" violates federal and/or state constitutional free speech guarantees because a test of "tolerance" is required. *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1029 (5th Cir.1981), *cert. denied*, 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982) ("[T]he line between protected expression and punishable obscenity must be drawn at the limits of a community's tolerance, rather than in accordance with the dangerous standards of propriety and taste."); *Home Box Office, Inc. v. Wilkinson*, 531 F.Supp. 987, 1001 (D.Utah 1982) ("To extend the reach of the criminal sanction beyond the sphere described in *Miller v. California* in hopes of effectively corralling individuals into making only 'right', 'proper' or 'decent' choices runs counter to the settled constitutional rule that the States have no power to control the moral content of a person's thoughts."); *Commu-*

---

The fact that the jury must measure patent offensiveness against contemporary community standards does not mean, however, that juror discretion in this area is to go unchecked. Both in *Hamling* [*v. United States*, 418 U.S. 87, 104, 94 S.Ct. 2887, 2900, 41 L.Ed.2d 590 (1974) ] and in *Jenkins v. Georgia*, 418 U.S. 153 [94 S.Ct. 2750, 41 L.Ed.2d 642] (1974), the Court noted that part (b) of the *Miller* test contained a substantive component as well. The kinds of conduct that a jury would be permitted to label as "patently offensive" in a § 1461 prosecution are the "hard core" types of conduct suggested by the examples given in *Miller*.

(Footnote omitted.) However, the Court in *Smith*, 431 U.S. 291, 302, 97 S.Ct. 1756, 1764, also stated: "It would be just as inappropriate for a legislature to attempt to freeze a jury to one definition of reasonableness as it would be for a legislature to try to define the contemporary community standard of appeal to prurient interest or patent offensiveness, if it were even possible for such a definition to be formulated." The cases enumerated and discussed in this section demonstrate that a number of courts and legislative bodies apparently presume that "patently offensive" must be defined or construed.

*nity Television of Utah, Inc. v. Roy City,* 555 F.Supp. 1164, 1171–72 (D.Utah 1982) (The tolerance standard is based on the need for "survival of the diversity of ideas and points of view. We tolerate the ideas of others and the communications which frame those ideas because we want others to tolerate us, our ideas, our points of view.... We need not approve, but we tolerate to the line of community standards drawn in *Miller*...."); *Goldstein v. Allain,* 568 F.Supp. 1377 (N.D.Miss.1983) (the definition of patently offensive defining that phrase in terms of community standards of decency infringes upon speech protected by the first amendment because the line between protected expression and punishable obscenity must be drawn at the limits of a community's tolerance); *Leech v. American Booksellers Association, Inc.,* 582 S.W.2d 738, 748 (Tenn.1979) (The "personally acceptable" standard impermissibly encroaches on the freedom of speech and press under article I, section 19 of the Tennessee Constitution. "It is obvious that the acceptance test would lead to the indiscriminate branding as obscene much of protected speech that would otherwise pass the tolerance test."). *But see Andrews v. State,* 652 S.W.2d 370 (Tex.Crim.App.1983) (the term "patently offensive" passes constitutional muster because in context within the statute the word "decency" states a common meaning of what governs current community standards, i.e., whether to the average person the material is so offensive on its face as to affront current community standards of propriety); *State v. Barrett,* 278 S.C. 92, 292 S.E.2d 590, 592 (1982) (the court dismissed the defendants' argument regarding tolerance and decency as follows: "Here, as is typical in obscenity cases, counsel 'picketh the nit.' Squabbles

over technicalities and definitions have lured the courts to write fluently, resulting, ofttimes in overdefining obscenity."). We adopt the majority view and hold that, in the circumstances of this case, a tolerance standard is required under the first amendment to the United States Constitution.[15] Because our constitution provides broader free speech protection, the tolerance test is required, at a minimum, to determine whether material or a performance is patently offensive. Accordingly, we hold that the definition of "patently offensive" in section 18–7–101(4) is unconstitutionally overbroad.

### V.

■ The defendants in *Mizell* contend that the presumption contained in section 18–7–102(4), 8 C.R.S. (1984 Supp.), is unconstitutional. That section provides that:

A person who possesses six or more identical obscene devices or six or more identical obscene materials is presumed to possess them with intent to promote the same.

We hold that this presumption comports with the requirements of due process and, thus, is constitutional.[16]

■ Initially, we note that it is settled that obscene materials are unprotected by either the first amendment of the United States Constitution or by section 10 of article II of the Colorado Constitution. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *People v. Tabron,* 190 Colo. 149, 544 P.2d 372 (1976). Thus, if the challenged presumption concerning obscenity does not offend due process guarantees and if it has no unjustified collateral inhibitory effect on protected speech, we will uphold its constitutionality.

15. Our decision should not be interpreted as approving definitively the tolerance standard. The parties' arguments have focused only on the contrast between "decency" and "tolerance." Our holding is limited to that issue. Thus, if a legislative body elects to define "patently offensive" using one of the two terms, it must choose "tolerance." However, as we stated in *supra* note 14, the question of whether patently offensive should or may be defined is an open question. Moreover, to what extent, if any, the tolerance standard may be constitutionally deficient is not an issue before us.

16. Because of our determination that those sections of the Act prohibiting the promotion of obscene devices are unconstitutional, the reference to such devices in section 18–7–102(4) is rendered superfluous and should be severed.

■■■■ The due process clause requires that a defendant be convicted only after proof beyond a reasonable doubt of every element of the crime charged. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *People v. Mattas*, 645 P.2d 254 (Colo.1982). Well-established principles of law proscribe the use in criminal cases of statutory presumptions that improperly shift the burden of proof, *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), or that conclusively presume an element of the offense. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Thus, it is clear that the presumption challenged here must be classified as permissive to comply with constitutional requirements. It must be construed to allow, but not to require, the trier of fact to infer the presumed fact (intent to promote) from the proven fact (possession of six or more identical obscene materials) and, of course, the jury must be properly instructed as to this effect.

■■■■ The power of the legislature to create statutory presumptions is limited by the due process clause. *Brown v. District Court*, 197 Colo. 219, 591 P.2d 99 (1979). The constitutional validity of a permissive presumption depends upon the existence of a rational connection between the fact to be inferred and the proven fact. *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). Due process requires, at a minimum, that a criminal presumption satisfy the following test: "[A] criminal statutory presumption must be regarded as 'irrational' or 'arbitrary' and hence unconstitutional, unless it can be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969). *See also Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); *People v. McClendon*, 188 Colo. 140, 533 P.2d 923 (1975). We conclude, as have other courts, that the presumption at issue here comports with the requirements of due process. *See Overstock Book Co. v. Barry*, 305 F.Supp. 842 (E.D.N.Y.1969), *aff'd* 436 F.2d 1289 (2d Cir.1970); *Rage Books, Inc. v. Leary*, 301 F.Supp. 546 (S.D.N.Y.1969). Assuming that the jury is properly instructed as to the operation of a permissive presumption, there is a sufficiently rational connection between the possession of six or more identical obscene materials and the intent to promote them to justify the use of the statutory presumption challenged here.[17]

The same defendants also challenge the constitutionality of the statutory presumption permitting the fact finder to infer knowledge of the contents of obscene material from the fact of the materials' promotion. We agree with their contention that the presumption violates due process principles because the overbreadth of the provision has a chilling effect on protected freedom of expression.

Section 18–7–102(1)(a), 8 C.R.S. (1984 Supp.), provides:

A person commits wholesale promotion of obscenity if, knowing its content and character, he wholesale promotes or possesses with intent to wholesale promote any obscene material or obscene device.

Section 18–7–102(3) contains the challenged presumption:

A person who promotes or wholesale promotes obscene material or an obscene device or possesses the same with intent to promote or wholesale promote it in the course of his business is presumed to do so with knowledge of its content and character.

---

17. We note that the first amendment protects the private possession of obscene materials in one's home from state regulation. *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). We view the presumption here, in conjunction with the exemption for conduct occurring in a person's residence in section 18–7– 102(6), as susceptible to proper construction to prevent an impermissible infringement on the right to privately possess such material. Such a narrowing construction, however, should best be accomplished within the context of an appropriate case.

■■■ In *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), the Supreme Court held that an ordinance proscribing the possession by a bookseller of obscene material could not constitutionally dispense with the requirement of scienter on the part of the defendant. In holding that strict liability for the possession of such material could not constitutionally be imposed upon a bookseller, the Court emphasized that special solicitude is appropriate in the area of first amendment rights: "Our decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression by making the individual the more reluctant to exercise it." *Smith,* 361 U.S. at 150–51, 80 S.Ct. at 217. The requirement that statutes or ordinances regulating obscenity contain an element of scienter is grounded upon the potential for a strict liability obscenity provision to inhibit the exercise of protected speech:

> By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. For if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature.

*Id.* at 153, 80 S.Ct. at 218 (footnote omitted). *See also Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (oath of non-membership in subversive organizations is unconstitutional because it did not distinguish between knowing and innocent association). Thus, the end result of a strict liability obscenity enactment is a privately administered system of censorship: "The bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly." *Smith,* 361 U.S. at 153–54, 80 S.Ct. at 219. *See also Mishkin v. New York,* 383 U.S. 502, 511, 86 S.Ct. 958, 965, 16 L.Ed.2d 56 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material. . . .").

Moreover, the Supreme Court has emphasized that the procedural apparatus within which a matter is determined is subject to special scrutiny when the right of free speech is implicated:

> [S]ince only considerations of the greatest urgency can justify restrictions on speech, and since the validity of a restraint on speech in each case depends on careful analysis of the particular circumstances . . . the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford.

*Speiser v. Randall,* 357 U.S. 513, 521, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460 (1958).

Thus, in *Speiser,* denial of a tax exemption for refusal to subscribe to a loyalty oath was unconstitutional in the procedural context of requiring the taxpayer to prove that he was a proper person to qualify for the exemption:

> The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens.

*Id.* at 526, 78 S.Ct. at 1342. The "transcendent value of speech" involved in *Speiser* required the invalidation of the statutes that shifted the burden of proof to the taxpayer because the provisions amounted to "a short-cut procedure which

must inevitably result in suppressing protected speech." *Id.* at 526, 528, 78 S.Ct. at 1342, 1343.

Presumptions similar or identical to the one at issue here have been invalidated as unconstitutional by various courts. In *State v. Bumanglag,* 63 Hawaii 596, 634 P.2d 80 (1981), for example, the court held that such a presumption[18] impermissibly inhibited free expression: "Its application would tend to limit public access to protected material because booksellers may then restrict what they offer to works they are familiar with and consider 'safe.' The distribution of protected, as well as obscene, matter may be affected by this self-censorship."[19] 634 P.2d at 96.

In *Davis v. State,* 658 S.W.2d 572 (Tex. Crim.App.1983), the court perceived a similar danger to the guarantees of the first amendment, noting that, especially in the case of a large establishment, "[t]he risk of suppressing freedom of expression is not negligible; ... it rises to astronomical proportions." 658 S.W.2d at 579. In addition to observing that the presumption cannot survive due process analysis, *see Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Texas court concluded that "[f]reedom of expression is too important a right to allow it to be seriously impeded or impaired by a presumption such as the one implicated in this case." 658 S.W.2d at 580. *See also Grove Press, Inc. v. Evans,* 306 F.Supp. 1084 (E.D.Va.1969); *Skinner v. State,* 647 S.W.2d 686 (Tex.App. 1982) (presumption impermissibly shifts burden of proof and eliminates element of

scienter); Model Penal Code § 251.4(2), comment 11 (1980) ("A presumption that one who disseminates or possesses obscene material in the course of his business does so knowingly or recklessly places a severe burden of prior examination and screening on legitimate business. It seems unlikely today that such a presumption would pass constitutional scrutiny."); Note, *The Scienter Requirement in Criminal Obscenity Prosecutions,* 41 N.Y.U.L.Rev. 791, 797–99 (1966) (evidentiary presumptions similar to the one at issue here are invalid after *Smith v. California*).

The Supreme Court has, on one occasion, expressly declined to reach the issue of the constitutionality of such presumptions. *Ginsberg v. New York,* 390 U.S. 629, 632 n. 1, 88 S.Ct. 1274, 1276 n. 1, 20 L.Ed.2d 195 (1968). More recently, however, in a case in which the same issue was raised, the Supreme Court dismissed an appeal for want of a substantial federal question in *People v. Kirkpatrick,* 32 N.Y.2d 17, 343 N.Y.S.2d 70, 295 N.E.2d 753 (1973), *appeal dismissed,* 414 U.S. 948, 94 S.Ct. 283, 38 L.Ed.2d 204 (1973). In *Kirkpatrick,* the state courts upheld the constitutionality of a statutory presumption that the seller of obscene materials knows the contents of that material, and also held that there was sufficient independent evidence of scienter to support the conviction.

This dismissal, in its procedural context, was equivalent to an adjudication of the federal issue on its merits.[20] *Hicks*

---

18. HRS § 712–1214 provided that:
(1) A person commits the offense of promoting pornography if, knowing its content and character, he:
(a) Disseminates for monetary consideration any pornographic material....
The presumption at issue, contained in HRS § 712–1216, provided that:
(1) The fact that a person engaged in the conduct specified by sections 712–1214 or 712–1215 is prima facie evidence that he engaged in that conduct with knowledge of the character and content of the material disseminated or the performance produced, presented, directed, participated in, exhibited, or to be exhibited....

19. Additionally, the court in *Bumanglag* implied that the challenged presumption violated due process. The court agreed that salespeople generally were less likely than not to know the contents of their entire stock: "We find this difficult to discount, for a conclusion that a person who sold a book also was familiar with its character and content does not comport with what common sense and experience tell us about booksellers, salesclerks and their knowledge of the contents of books." 634 P.2d at 96.

20. We are aware that summary affirmances have sometimes been accorded less than full precedential weight by the Supreme Court. *See Edelman v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974); *Richardson*

*v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *see generally* R. Stern & E. Gressman, *Supreme Court Practice* § 5.18 (1978). However, we agree with those courts that have found the dismissal of the appeal in *Kirkpatrick* ambiguous or inconclusive on the issue of the constitutionality of the presumption challenged here.[21] *E.g., Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1031 (5th Cir.1981) (discerning no "definitive guidance" from the Supreme Court's dismissal); *State v. Bumanglag,* 63 Hawaii 596, 634 P.2d 80 (1981).

In *Bumanglag,* the Supreme Court of Hawaii considered the effect of the summary dismissal in *Kirkpatrick* uncertain in light of the difficulty of discerning the precise constitutional challenges raised against the presumption in question. We agree with the Hawaii court that, because of the inexactness of the analysis presented in *Kirkpatrick,* we are not foreclosed from considering the first amendment overbreadth issue. Given the ambiguity of the Supreme Court's decision in *Kirkpatrick,* we hesitate to read the summary affirmance of the New York Court of Appeals' opinion "as a renunciation by [the Supreme Court] of doctrines previously announced...." *Fusari v. Steinberg,* 419 U.S. 379, 392, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring).

In our view, the presumption of scienter contained in section 18–7–102(3), 8 C.R.S. (1984 Supp.), creates an unjustified constraint on expression protected by the first amendment of the United States Constitution and, more especially, by section 10 of article II of the Colorado Constitution.[22]

## VI.

The trial court in *Adult Literary Guild v. Beacom* found that the following terms contained in section 18–7–101(2)(b) were unconstitutionally overbroad: "sadism," "masochism," "sodomy," "bestiality," "masturbation," "lewd exhibition of the genitals," "the male or female genitals in a state of sexual stimulation or arousal," "device designed and marketed as useful primarily for stimulation of the human genital organs," and "perverted." We agree with the defendants' contention that this determination was erroneous.

In finding these terms constitutionally defective, the trial court relied on our opinion in *People v. Tabron,* 190 Colo. 149, 544 P.2d 372 (1976). In *Tabron,* we held that the Colorado obscenity statute then in effect did not conform to the specificity standards articulated by the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The trial judge in *Beacom* relied in particular on that aspect of *Tabron* holding that the proscriptions of the Colorado statute lacked the specificity required by *Miller:*

> Given their plain and ordinary meaning, the words "nudity, sex, sexual conduct, sexual excitement, ... sadism, masochism, or sado-masochistic abuse," are not representative of the specificity contemplated by the Supreme Court in *Miller....* The statutory definition of "obscene" in Colorado is drawn overly broad in that it obviously includes activities which could be described or depicted in

---

*v. Ramirez,* 418 U.S. 24, 83 n. 27, 94 S.Ct. 2655, 2685 n. 27, 41 L.Ed.2d 551 (1974) (Marshall, J., dissenting). We do not infer, however, that state courts and lower federal courts are free to ignore the precedent represented by summary affirmances. *See Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). *See generally* R. Stern & E. Gressman, *Supreme Court Practice* § 4.31 (1978).

**21.** At least one court has apparently drawn no inference whatever from the dismissal in *Kirkpatrick.* In *Young v. Abrams,* 698 F.2d 131 (2d Cir.1983), the court held that the application of

the identical presumption at issue in *Kirkpatrick* did not constitute reversible error where there was sufficient evidence of scienter. The court in *Abrams* did not rely on *Kirkpatrick* as authority for the validity of the presumption, reaching that conclusion through its own independent analysis.

**22.** In section II.B., we stated that article II, section 10 of the Colorado Constitution provides broader free speech protections than does its federal counterpart.

some context other than an erotic one. In our opinion, the statute fails to describe an "ultimate sexual act," as suggested by *Miller*, and this lack of specificity renders the Colorado definition of obscenity constitutionally defective as measured by part (b) of the *Miller* standards.

*Tabron*, 190 Colo. at 159, 544 P.2d at 379 (citations omitted).

■ The *Miller* guidelines, under which material must be evaluated to determine whether it is constitutionally unprotected obscenity, included the following component: "[W]hether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2615. Although, as we noted in *Tabron*, the Court was "less than munificent" in its guidance regarding the boundaries of the above requirement, *Tabron*, 190 Colo. at 156, 544 P.2d at 377, the Court did make clear that the sexual conduct depicted in regulated material "must be specifically defined by the applicable state law, as written or authoritatively construed." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2615.

While declining to propose to the states detailed or precise regulatory schemes, the Court in *Miller* enumerated "a few plain examples" of material properly subject to regulation by a state: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.* at 25, 93 S.Ct. at 2615. The Court in *Miller* expressed confidence that the standards set out there would provide "fair notice" of possible prosecution to those who purvey obscenity. *Id.* at 27, 93 S.Ct. at 2616. The Court further affirmed that "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by

the regulating state law, as written or construed." *Id.*

The specificity requirement imposed upon state obscenity statutes has been reaffirmed and, to some extent, clarified by Supreme Court decisions subsequent to *Miller*. In *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), for example, the Court made clear that, while the examples given in *Miller* of material properly subject to regulation by the state were not meant to be exhaustive, they were intended to indicate the "substantive constitutional limitations, deriving from the First Amendment, on the type of material" that could be proscribed. *Jenkins*, 418 U.S. at 160, 94 S.Ct. at 2755.

That the specific examples given in *Miller* were illustrative of the boundaries delimiting the class of obscene materials has been reiterated by the Court:

> While the particular descriptions there contained were not intended to be exhaustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is "patently offensive" within the meaning of the obscenity test set forth in the *Miller* cases.

*Hamling v. United States*, 418 U.S. 87, 114, 94 S.Ct. 2887, 2906, 41 L.Ed.2d 590 (1974).

We hold that the legislative enactment presently under consideration complies with the specificity requirement enunciated in *Miller* and refined in later cases. The General Assembly's efforts to specifically define the sexual conduct which may not legitimately be portrayed is contained in section 18–7–101(2)(b). That section defines "obscene" as material or a performance that depicts or describes:

> (I) Patently offensive representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

> (II) Patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or

female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or device designed and marketed as useful primarily for stimulation of the human genital organs....

§ 18–7–101(2)(b)(I), (II), 8 C.R.S. (1984 Supp.).

■ We note that these statutory descriptions contain within them the precise examples set out in *Miller*. We view these examples, as have other courts, as being sufficiently specific to satisfy the requirements of *Miller* without further explication by the state. *See, e.g., United States v. Various Articles of Obscene Merchandise, Schedule No. 1769*, 600 F.2d 394 (2d Cir. 1979) (patently offensive conduct must at a minimum be a depiction of the activities listed in *Miller* or of similar activities); *Eagle Books, Inc. v. Reinhard*, 418 F.Supp. 345 (N.D.Ill.1976) (examples given in *Miller* are of "what would be sufficiently specific").

Nor do we view the addition to section 18–7–101(2)(b) of types of conduct not specifically listed in *Miller* to be fatal to the statute. Although we indicated in *Tabron* that the inclusion of the terms "sadism" and "masochism" rendered that obscenity statute overbroad, a subsequent Supreme Court decision suggested that we relied in *Tabron* on a too literal reading of *Miller*. In *Ward v. Illinois*, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977), the Court expressly recognized that sado-masochistic materials were of the type intended to be denied the constitutional protection of the first amendment under the *Miller* test. *See also Mishkin v. New York*, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966). The state statute in *Ward* was held not to be substantially overbroad, notwithstanding its failure to provide "an exhaustive list

of the sexual conduct the patently offensive description of which may be held obscene...." *Ward*, 431 U.S. at 776, 97 S.Ct. at 2091. Given the inclusion in section 18–7–101(2)(b) of the examples set out in *Miller* and the subsequent clarifications offered by *Ward*, we conclude that the sections of the Act at issue here are sufficiently specific to satisfy constitutional requirements.[23]

The defendants in *Seven Thirty-Five East Colfax, Inc.* and *Mizell* also assert that various defects render the following statutory terms constitutionally defective: "prurient interest," "material," and "promote." We reject these arguments.

■ The defendants' contention that the term "prurient interest" must be further defined by the statute is without merit. We agree with the Court of Appeals for the Fifth Circuit that, although "[m]any jurors may find it helpful to learn that 'prurient interest' means shameful and morbid," it is not a constitutional requirement that such a definition be included in the Act.[24] *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1026 (5th Cir.1981). *See also Stonelake v. State*, 638 S.W.2d 619 (Tex.App.1982).

■ We also conclude that the defendants have failed to sustain their burden of demonstrating that the statutory terms "materials" and "promote" are constitutionally defective. § 18–7–101(1), (6), 8 C.R.S. (1984 Supp.). The defendants have asserted that these terms are unconstitutionally overbroad; however, no persuasive examples of such infirmity have been suggested. Given that the statutory scheme requires that these words only apply to "obscene" matter as defined in section 18–7–101(2), we fail to perceive how the application of the terms at issue will result in an

---

**23.** The remaining additions to the statute describe the sort of hardcore sexual conduct meant to be exemplified in *Miller*. Further, as one court has noted, the reference to depictions of stimulated or turgid genitals was contained in the state statutes cited in *Miller* as acceptable statutory enactments. *Miller*, 413 U.S. at 24 n. 6, 93 S.Ct. at 2615 n. 6. Further, the inclusion of masturbatory aids does not render the statute

vague or overbroad. *See Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020 (5th Cir.1981).

**24.** We are not presented with, nor do we reach, the issue whether a conviction may be overturned for the trial court's failure to instruct a jury on the meaning of prurient interest.

infringement of constitutional rights.[25] Moreover, in our view these terms are subject to proper narrowing construction should the danger of overbreadth appear in subsequent cases.

## VII.

A number of the parties who challenge the Act contend that the provisions regulating the promotion of obscene devices unconstitutionally infringe on their free speech rights and on the due process rights of purchasers of those devices. We hold that the statutory scheme impermissibly burdens the right of privacy.

### A.

■ Preliminarily, we consider the standing question. Applying the principles relevant to third-party standing enunciated in *State Board for Community Colleges v. Olson*, 687 P.2d 429 (Colo.1984), we conclude that Adult Literary Guild has standing to assert the due process rights of purchasers of these articles. In *Olson* we stated that:

[A] plaintiff who demonstrates an actual injury sufficient to guarantee concrete adverseness may be permitted to assert the rights of third parties not before the court when at least one of the following factors is present: the presence of a substantial relationship between the plaintiff and the third party; the difficulty or improbability of these third parties in asserting an alleged deprivation of their own rights; or the existence of some need to avoid dilution of third party rights in the event standing is not permitted.

687 P.2d at 435.

■ This test is sufficiently satisfied here. We accept as true Adult Literary Guild's allegation that it will be injured in fact through prosecution for selling the proscribed articles. Further, "[t]he legal duties created by the statutory sections under challenge are addressed directly to vendors" such as the plaintiff. *Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). As in *Craig*, the plaintiff here is obliged to choose between conformance to the statute, and consequent economic injury, or disobedience and possible criminal prosecution. This status establishes the requisite injury in fact in order to insure "concrete adverseness *vis-a-vis* the defendants sufficient to assure the effective presentation of the issues...." *Olson*, 687 P.2d at 440.

■ Moreover, as in *Olson*, the consumers' privacy right in the use of the proscribed articles is "inextricably bound up" with the activity prohibited by the statute—the promotion of these articles. *Id.* at 440. We view this case, for purposes of the standing analysis, as analogous to *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), in which the Supreme Court held that a retailer of contraceptive devices had standing to assert the constitutional rights of its customers. In this case, as in *Carey*, the danger that the constitutional rights of third parties would be diluted or adversely affected should Adult Literary Guild's challenge fail is sufficient to confer standing upon the plaintiff to assert the rights of its customers. *Carey*, 431 U.S. at 684, 97 S.Ct. at 2015. *See Olson*, 687 P.2d at 440. Adult Literary Guild, like the plaintiff in *Carey*, is "among the 'vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market....'" *Carey*, 431 U.S. at 684, 97 S.Ct. at 2015 (quoting *Craig v. Boren*, 429 U.S. 190, 195, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976)).[26]

---

25. The hypothetical examples of possible overbreadth in the application of the term "promote" given in *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020 (5th Cir.1981), apply to the section of the statute proscribing the promotion of obscene devices. Given our determination that the analogous section of the Colorado Obscenity Act is unconstitutional, we need not address the concerns raised in *Red Bluff Drive-In*.

26. We do not wish to be understood, however, as implying that distributors of obscene materials have standing to assert the rights of purchas-

### B.

Section 18–7–102(2)(a)(I) provides that a person is guilty of a class 2 misdemeanor if he "[p]romotes or possesses with intent to promote any ... obscene device...." An obscene device is defined as "a device including a dildo or artificial vagina, designed or marketed as useful primarily for the stimulation of human genital organs." § 18–7–101(3), 8 C.R.S. (1984 Supp.).

 It is firmly established that the liberty interest protected by the due process clause of the United States Constitution encompasses "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The Supreme Court has stated of this privacy interest that:

> While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); procreation, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541–542 [62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655] (1942); contraception, *Eisenstadt v. Baird*, 405 U.S. [438] at 453–454 [92 S.Ct. 1029, 1038–1039, 31 L.Ed.2d 349

(1972) ]; *id.,* at 460, 463–465 [92 S.Ct. at 1041, 1043–1044] (White, J., concurring in result); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925); *Meyer v. Nebraska,* [262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) ]." *Roe v. Wade, supra,* [410 U.S. 113] at 152–153 [93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (1973) ]. See also *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640 [94 S.Ct. 791, 796, 39 L.Ed.2d 52] (1974).

*Carey v. Population Services International,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977). This privacy right has been characterized as protecting "the personal intimacies of the home," *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973), and the Supreme Court has stressed that "also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969).

 We need not decide whether the state may properly regulate the kinds of devices sought to be prohibited by this

---

ers to buy such materials for use in their homes. *See Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). We view the right implicated by the broadly worded statute proscribing sexual devices as within the sphere of constitutionally protected privacy which encompasses the intimate medical problems associated with sexual activity. *See United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 127 n. 4, 93 S.Ct. 2665, 2668 n. 4, 37 L.Ed.2d 500 (1973). Standing by distributors to assert the derivative rights of purchasers in these circumstances has often been granted. *E.g., Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). In contrast, the Supreme Court has explicitly held that the limited right established in *Stanley* to privately possess obscene materials does not extend to the means of their acquisition and distribution. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *See*

*also United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). Thus, a distributor of obscene material purporting to assert the rights of the purchaser would generally be unable to show that "the particular constitutional ... provision underlying the claim creates a right or interest ... that has been arguably abridged by the challenged governmental action." *State Board for Community Colleges v. Olson,* 687 P.2d 429, 435 (Colo.1984). Moreover, we note that the right to privately possess such materials is protected by section 18–7–102(6) which exempts application of the Act to conduct occurring in a person's residence. This exemption, however, is not sufficiently broad to permit a person to purchase one of the prohibited devices.

statute. Sections 18–7–101(3) and 102(2)(a)(I), however, sweep too broadly in their blanket proscription of all devices "designed or marketed as useful primarily for the stimulation of human genital organs." The statutory scheme, in its present form, impermissibly burdens the right of privacy of those seeking to make legitimate medical or therapeutic use of such devices.[27] The effect of the statute as now written is to equate sex with obscenity.[28] The state has demonstrated no interest in the broad prohibition of these articles sufficiently compelling to justify the infringement on the privacy right of those seeking to use them in legitimate ways. Thus, we hold the statutory prohibition against the promotion of obscene devices to be unconstitutional.

## VIII.

Seven Thirty-Five East Colfax challenges section 18–7–103, 8 C.R.S. (1984 Supp.), which authorizes the district courts "to enjoin the wholesale promotion, promotion, or display of obscene materials...." § 18–7–103(1), 8 C.R.S. (1984 Supp.). Seven Thirty-Five East Colfax claims that the procedures provided by section 18–7–103 do not satisfy the requirements announced by the Supreme Court in *Freedman v. Maryland,*

380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

■ Any system of prior restraint is subject to a heavy presumption against its constitutional validity. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The Supreme Court has declined to hold the prior restraints of expression unconstitutional per se. *Times Film Corp. v. Chicago,* 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961). In *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), the Court stated:

> We held in *Freedman,* and we reaffirm here, that a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured.

(Emphasis in original.) *See also People v. Harvey,* 176 Colo. 447, 491 P.2d 563 (1971).

■ The essence of the argument made by Seven Thirty-Five East Colfax is that

27. The Food and Drug Administration has promulgated the following regulations concerning powered vaginal muscle stimulators and genital vibrators:

§ 884.5940 *Powered vaginal muscle stimulator for therapeutic use.*

(a) *Identification.* A powered vaginal muscle stimulator is an electrically powered device designed to stimulate directly the muscles of the vagina with pulsating electrical current. This device is intended and labeled for therapeutic use in increasing muscular tone and strength in the treatment of sexual dysfunction. This generic type of device does not include devices used to treat urinary incontinence.

(b) *Classification.* Class III (premarket approval).

§ 884.5960 *Genital vibrator for therapeutic use.*

(a) *Identification.* A genital vibrator for therapeutic use is an electrically operated device intended and labeled for therapeutic use in the treatment of sexual dysfunction or as

an adjunct to Kegel's exercise (tightening of the muscles of the pelvic floor to increase muscle tone).

(b) *Classification.* Class II (performance standards).

21 C.F.R. §§ 884.5940 & 884.5960 (1984).

28. The legislature has labeled all devices "useful primarily for the stimulation of human genital organs" as obscene. However, the definition of "obscene" in sections 18–7–101(1) and (2) specifically excludes obscene devices. Therefore, it is uncertain whether such devices are "obscene," for as we observe *supra* note 27, at least some of the proscribed devices apparently have a therapeutic use. Any statutory scheme adopted by the legislature must be compatible with the right of a person to engage in sexual activities to the extent that right is encompassed within the constitutional right of privacy. Therefore, the questions of whether such sexual devices can be defined in accordance with constitutional requirements and whether their sale and use may be regulated are issues which we leave for another day.

section 18–7–103 fails to require a specific time period within which hearings must be held. We reject its argument. Prompt judicial involvement and review is not only contemplated but required by the statute. First, section 18–7–103(4) requires that notice be given before a temporary restraining order or temporary injunction affecting any materials may be issued. Second, the party sought to be restrained may request that the trial of the action on the merits be consolidated with the hearing on the request for a temporary injunction or restraining order. § 18–7–103(5), 8 C.R.S. (1984 Supp.). Third, if no request for consolidation is made, the final hearing shall be held "within one day after joinder of the issues in the case." *Id.* Fourth, the trial court must make a decision within two days after the conclusion of the trial or the injunction must be dissolved. *Id.* Fifth, no temporary injunction or restraining order may be issued until the district attorney has made a showing of probable cause to believe that the material or display is obscene and has made a satisfactory showing of probable success on the merits. *Id.* We conclude that the procedures established by section 18–7–103 do not run afoul of the requirements promulgated by the Court in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).[29] *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (a statutory scheme providing less protection to exhibitors was found not to violate the due process clause).

## IX.

Finally, we examine the severability questions raised by our holdings in these cases. In *City of Lakewood v. Colfax Unlimited Association*, 634 P.2d 52, 70 (Colo. 1981), we summarized the general rule concerning severability as follows:

> [I]f a statute or ordinance is constitutional in one part and unconstitutional in

another, the constitutional provision may be sustained and the unconstitutional stricken.... Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portion remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body.

(Citations omitted.) A qualified severability clause will be used by the judiciary as an aid in determining legislative intent. *Smith Brothers Cleaners & Dyers v. People ex rel. Rogers*, 108 Colo. 449, 119 P.2d 623 (1941). Such a clause creates a presumption that the legislature would have been satisfied with the portions of the statute that remain after the offending provisions are stricken as being unconstitutional. *Lakewood v. Colfax Unlimited Association*, 634 P.2d 52 (Colo.1981). The Act contains a qualified severability provision which states:

> *Severability.* If any provision of this part 1 is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of this part 1 are valid, unless it appears to the court that the valid provisions of this part 1 are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed that the general assembly would have enacted the valid provisions without the void provision or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

§ 18–7–105, 8 C.R.S. (1984 Supp.). It is against this backdrop of the statute and general principles that we now focus on the particular words or provisions which we have determined violate constitutional requirements and decide if the Act may be saved.

---

**29.** We find no basis in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), to conclude that the distinction between obscene devices, motion pictures, and other materials and performances created by sections 18–

7–103(3) and (4) is irrational, as suggested by Seven Thirty-Five East Colfax. To the extent that its argument raises an equal protection challenge to the statute, we save that issue for another day.

### A.

In section III, we held that the word "accredited" as used in the Act is unconstitutionally vague. The issue thus presented is whether the appropriate remedy is to declare invalid section 18–7–104 in its entirety, or to strike the word "accredited" from the exemption provision.

We reject the first alternative. Striking the entire section would make the Act applicable to classes of persons and facilities which the legislature clearly intended to be exempt and would be nothing short of legislation. *Marsh v. Hanly*, 111 Cal. 368, 43 P. 975 (1896).

> [W]hen the General Assembly enacts a prohibition with an excepted class that is subsequently found to be constitutionally infirm, ordinarily it will not be presumed that the General Assembly would have enacted the prohibition without the exception. Such a presumption would extend the prohibition to a class of persons whom the General Assembly clearly intended should not be reached.

*Turner v. State*, 299 Md. 565, 474 A.2d 1297, 1303 (1984).

Moreover, striking the entire section might well necessitate declaring the Act unconstitutional in toto, leaving the state without any regulation of obscenity. Such was not the legislature's intent. In *Lynden Transport, Inc. v. State*, 532 P.2d 700, 714 (Alaska 1975), the court stated:

> While cognizant of this and other contrary authority, we are of the opinion that a general ruling which states that the invalidation of an exception automatically precludes severability is overbroad. It remains a question of legislative intent and the rule concerning invalidated exceptions is just another aid in determining that intent.

(Footnote omitted.) Here, the primary goal of the General Assembly was to regulate obscenity and this purpose should not be disturbed because of an unconstitutional flaw in the exception statute. *Id.* In addition, striking the exemption provision from the Act would raise the specter of ex post facto application of the Act. Judicial constructions of statutes which add a "clarifying gloss" are permissible, but a retroactive application of a judicial expansion of statutory language is forbidden. *See Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *People v. Tabron*, 190 Colo. 149, 544 P.2d 372 (1976). We recognize that striking the word "accredited" from the statute arguably may permit the exhibition of obscene movies by commercial theaters. Given the choice between no regulation of obscenity and permitting the showing of obscene movies, we believe the legislature would have chosen the second alternative. Accordingly, we strike the word "accredited" from section 18–7–104.

### B.

In section IV, we determined that defining "patently offensive" in terms of community standards of decency violated the constitutional prohibition against overbreadth. Application of the general principles and the qualified severability statute to this determination leads us to conclude that the definition of "patently offensive" is severable from the remainder of the Act. The remaining sections of the Act are not rendered defective or inapplicable if the definition is stricken. In addition, we believe the legislature would have enacted the Act even if the definition of "patently offensive" had not been included in Senate Bill 38. Therefore, section 18–7–101(4) is severed from the remainder of the Act.

### C.

We reach a similar conclusion with regard to the severability of those portions of the Act prohibiting the promotion or wholesale promotion of obscene devices. The invalid provisions regarding obscene devices purported to regulate articles separate and independent from the obscene material regulated elsewhere in the Act. Severing the void provisions leaves the remaining statute autonomous and coherent and we presume that the legislature would

have intended this result. Thus, the provisions of the Act prohibiting the promotion or wholesale promotion of obscene devices are severed.

## D.

■ In section V, we concluded that the presumption provided by section 18-7-102(3) was inconsistent with due process requirements. However, we conclude that this section may be safely severed from the Act.

A number of courts and commentators have noted that the prosecution's burden of proving the requisite element of scienter without the benefit of the presumption has not proven to be overly onerous. The Supreme Court in *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), addressed this concern:

> We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind.... Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.

*Id.* at 154, 80 S.Ct. at 219. *See also Hamling v. United States*, 418 U.S. 87, 123, 94 S.Ct. 2887, 2910, 41 L.Ed.2d 590 (1974) (prosecution need only show that a defendant had knowledge of the contents of material. To require knowledge that it was obscene would permit the defendant to escape liability by "simply claiming that he had not brushed up on the law.").

Cases subsequent to *Smith* have demonstrated the accuracy of this observation. It is clear that the element of scienter may be established by a showing of constructive knowledge. *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978). Such constructive knowledge has been found by various courts to exist in a wide range of circumstances. *E.g., Lakin v. United States*, 363 A.2d 990 (D.C.1976) (machine for wrapping magazines in cellophane in conjunction with presence of wrapped adult magazines justifies inference of scienter); *Kramer v. United States*, 293 A.2d 272 (D.C.1972) (seller recommended some material over others); *People v. Williamson*, 207 Cal.App.2d 839, 24 Cal.Rptr. 734 (1962) (complaints about "filthy" material); *State v. Cercone*, 2 Conn.Cir. 144, 196 A.2d 439 (1963) (adult books kept segregated); *People v. Sikora*, 32 Ill.2d 260, 204 N.E.2d 768 (1965) (defendant specialized in selling books of that type); *City of Cincinnati v. Coy*, 115 Ohio App. 478, 182 N.E.2d 628 (1962) (titles of the books are "vile and morbid" or "lurid"); *State v. Hull*, 86 Wash.2d 527, 546 P.2d 912 (1976) (seller examined cover and one inside page).

In one case, in which the defendant sold a film, on the canister of which were pictures of people engaged in various sexual acts, the court rejected the defendant's allegation that scienter had not been shown with the observation that:

> This question by the appellant [concerning scienter] borders on the ludicrous. Any adult human being who could pick up the packages, above described, and sell them to a customer in a store, as above described, would indeed be out of touch with reality if he did not know and understand the nature of the object he was selling.

*Sedelbauer v. State*, 428 N.E.2d 206, 210 (Ind.1981). *See generally* Note, *The Scienter Requirement in Criminal Obscenity Prosecutions*, 41 N.Y.U.L.Rev. 791 (1966) ("[A]side from an occasional aberrational case, prosecutors have had absolutely no difficulty in proving the requisite scienter.").

We anticipate that prosecutors will not encounter great difficulty in establishing the necessary knowledge, especially in the case of an adult bookstore stocked largely or exclusively with hardcore sexually oriented material. In our view, the danger that the absence of the presumption of scienter will disable the state from prosecuting the promotion of obscenity is insufficient to justify the presumption's inhibiting effect on the free speech provision of the

Colorado Constitution. Therefore, section 18–7–102(3) is severed from the Act.

## X.

The judgment of the district court in *People v. Seven Thirty-Five East Colfax, Inc.*, No. 82SA212, is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

The judgment of the district court in *People v. Mizell*, No. 83SA83, is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

The judgment of the district court in *Adult Literary Guild, Inc. v. Beacom*, No. 83SA99, is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

ERICKSON, C.J., concurs in part and dissents in part.

## APPENDIX A

### PART 1

### OBSCENITY—OFFENSES

*18–7–101. Definitions.* As used in this part 1, unless the context otherwise requires:

(1) "Material" means anything tangible that is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound, or in any other manner, but does not include an actual three dimensional obscene device.

(2) "Obscene" means material or a performance that:

(a) The average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(b) Depicts or describes:

(I) Patently offensive representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(II) Patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or device designed and marketed as useful primarily for stimulation of the human genital organs; and

(c) Taken as a whole, lacks serious literary, artistic, political, or scientific value.

(3) "Obscene device" means a device including a dildo or artificial vagina, designed or marketed as useful primarily for the stimulation of human genital organs.

(4) "Patently offensive" means so offensive on its face as to affront current community standards of decency.

(5) "Performance" means a play, motion picture, dance, or other exhibition performed before an audience.

(6) "Promote" means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise, or to offer or agree to do the same.

(7) "Simulated" means the explicit depiction or description of any of the types of conduct set forth in paragraph (b) of subsection (2) of this section, which creates the appearance of such conduct.

(8) "Wholesale promote" means to manufacture, issue, sell, provide, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, or to offer or agree to do the same for purpose of resale.

(9) If any of the depictions or descriptions of sexual conduct described in this section are declared by a court of competent jurisdiction to be unlawfully included herein, this declaration shall not invalidate this section as to other patently offensive sexual conduct included herein.

*18–7–102. Obscenity.* (1)(a) A person commits wholesale promotion of obscenity if, knowing its content and character, he wholesale promotes or possesses with intent to wholesale promote any obscene material or obscene device.

(b) Wholesale promotion of obscenity is a class 1 misdemeanor.

(2)(a) A person commits promotion of obscenity if, knowing its content and character, he:

(I) Promotes or possesses with intent to promote any obscene material or obscene device; or

(II) Produces, presents, or directs an obscene performance or participates in a portion thereof that is obscene or that contributes to its obscenity.

(b) Promotion of obscenity is a class 2 misdemeanor.

(3) A person who promotes or wholesale promotes obscene material or an obscene device or possesses the same with intent to promote or wholesale promote it in the course of his business is presumed to do so with knowledge of its content and character.

(4) A person who possesses six or more identical obscene devices or six or more identical obscene materials is presumed to possess them with intent to promote the same.

(5) This section does not apply to a person who possesses or distributes obscene material or obscene devices or participates in conduct otherwise proscribed by this section when the possession, participation, or conduct occurs in the course of law enforcement activities.

(6) This section does not apply to a person's conduct otherwise proscribed by this section which occurs in that person's residence as long as that person does not engage in the wholesale promotion or promotion of obscene material in his residence.

*18-7-103. Injunctions to restrain the promotion of obscene materials and obscene devices.* (1) The district courts of this state and the judges thereof shall have full power, authority, and jurisdiction to enjoin the wholesale promotion, promotion, or display of obscene materials and obscene devices as specified in this section and to issue all necessary and proper restraining orders, injunctions, and writs and processes in connection therewith not inconsistent with this article.

(2) The district attorney of the county in which a person, firm, or corporation wholesale promotes, promotes, or displays, or is about to wholesale promote, promote, or display, or has in his, her, or its possession with intent to wholesale promote, promote, or display, or is about to acquire possession with intent to wholesale promote, promote, or display, any obscene material or obscene device, may maintain an action for injunction against such person, firm, or corporation to prevent the wholesale promotion, promotion, or display or further wholesale promotion, promotion, or display of said material or device described or identified in said suit for injunction.

(3) This article shall not authorize the issuance of temporary restraining orders except for such restraining orders issued in relation to the wholesale promotion, promotion, or display of obscene devices or where exigent circumstances require the same. In matters of exigent circumstances, the restraining order shall provide that the action must be commenced on the earliest possible date. No temporary restraining order may be issued to restrain the continued exhibitions of a motion picture being shown commercially before the public, notwithstanding the existence of exigent circumstances.

(4) No temporary restraining order or temporary injunction other than those issued as to obscene devices may be issued except after notice to the person, firm, or corporation sought to be enjoined and only after all parties have been offered or afforded an opportunity to be heard. A person, firm, or corporation shall be deemed to have been offered or afforded an opportunity to be heard if notice has been given and he, she, or it fails to appear. At such hearing, evidence shall be presented and witnesses examined.

(5) Before or after the commencement of the hearing of an application for a temporary injunction (other than those sought to be issued in connection with obscene devices), the court may, and on motion of the

party sought to be restrained shall, order the trial on the action on the merits to be advanced and consolidated with the hearing on the application. Where such hearings are not so consolidated, and a temporary injunction or restraining order (other than those issued as to obscene devices) is issued, the court shall hold a final hearing and a trial of the issues within one day after joinder of issue, and a decision shall be rendered within two days of the conclusion of the trial. If a final hearing is not held within one day after joinder of issue or a decision not rendered within two days of the conclusion of the trial, the injunction shall be dissolved. No temporary injunction or restraining order shall issue until after a showing of probable cause to believe that the material, device, or display is obscene and a showing of probable success on the merits. Any such temporary injunction or restraining order (other than those issued as to obscene devices) shall provide that the defendant may not be punished for contempt if the material is found not to be obscene after joinder of issue, final hearing, and trial.

(6) Nothing contained in this article shall prevent the court from issuing a temporary restraining order forbidding the removing, destroying, deleting, splicing, or otherwise altering of any motion picture alleged to be obscene.

(7) Any person, firm, or corporation sought to be permanently enjoined shall be entitled to a full adversary trial of the issues within one day after the joinder of issue, and a decision shall be rendered by the court within two days of the conclusion of the trial. If the defendant in any suit for a permanent injunction filed under the terms of this article shall fail to answer or otherwise join issue within the time required to file his, her, or its answer, the court, on motion of the party applying for the injunction, shall enter a general denial for the defendant and set a date for hearing on the question raised in the suit for injunction within ten days following the entry of the general denial entered by the court. The court shall render its decision within two days after the conclusion of the hearing.

(8) In the event that a final order or judgment of injunction is entered against the person, firm, or corporation sought to be enjoined, such final order or judgment shall contain a provision directing the person, firm, or corporation to surrender to the sheriff of the county in which the action was brought any of the matter described in subsection (2) of this section, and such sheriff shall be directed to seize and destroy the same six months after the entry of the said final order unless criminal proceedings or an indictment is brought before that time in which event said material may be used as evidence in such criminal proceeding.

(9) In any action brought as herein provided, the district attorney shall not be required to file any undertaking, bond, or security before the issuance of any injunction order provided for above, shall not be liable for costs, and shall not be liable for damages sustained by reason of the injunction order in cases where judgment is rendered in favor of the person, firm, or corporation sought to be enjoined.

(10) Every person, firm, or corporation who wholesale promotes, promotes, displays, or acquires possession with intent to wholesale promote, promote, or display any of the matters described in subsection (2) of this section, after the service upon him of a summons and complaint in an action brought pursuant to this article, is chargeable with knowledge of the contents.

*18-7-104. Applicability of this part 1.*
(1) Nothing contained in this part 1 shall be construed to apply to:

(a) The possession, purchase, distribution, exhibition, or loan of any work of art, book, magazine, or other printed or manuscript material by any accredited museum, library, school, or institution of higher education;

(b) The exhibition or performance of any play, drama, tableau, or motion picture by any accredited theater, museum, library, school, or institution of higher education.

*18-7-105. Severability.* If any provisions of this part 1 is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of this part 1 are valid, unless it appears to the court that the valid provisions of this part 1 are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed that the general assembly would have enacted the valid provisions without the void provision or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

*18-7-106. Constitutional questions expedited.* (1) Any action in which the constitutionality of this part 1 is challenged shall take precedence over all other business pending before the court. An appeal from the judgment or final order of the court may be taken to the supreme court, the same as in other cases; except that the supreme court shall advance the case to the head of the calendar and hear and determine the same with reasonable dispatch.

(2) This section shall be repealed, January 1, 1983.

Section 2. *Effective date—applicability.* This act shall take effect July 1, 1981, and shall apply to offenses alleged to have been committed on or after said date.

Section 3. *Safety clause.* The general assembly hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, and safety.

Approved: June 5, 1981.

ERICKSON, Chief Justice, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part. I agree that the definition of "patently offensive" in section 18–7–101(4), 8 C.R.S. (1984 Supp.) is unconstitutionally overbroad because the term is defined in terms of community standards of decency. However, I do not agree that the defective term may be effectively severed from the statute without rendering the balance of the Act unconstitutional.

We have held that where first amendment freedoms are at stake, precision in drafting and clarity of purpose are priority considerations. *People v. Tabron,* 190 Colo. 149, 544 P.2d 372 (1976); *see Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). The term "obscene," as defined by section 18–7–101(2), 8 C.R.S. (1984 Supp.), is central to the legislative scheme of Colorado's obscenity statute, and its validity is dependent upon the constitutional standard of "patently offensive." *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Inasmuch as the "patently offensive" standard as prescribed by the General Assembly is unconstitutionally overbroad, I would conclude that the statutory definition of "obscene" must also fall as being unconstitutionally infirm.

While I recognize that the General Assembly may be prohibited from adopting specific criteria defining a community standard of patent offensiveness, *see Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977); *cf.* Op. at 359–360, n. 14, I do not read our federal guidelines as precluding the state from establishing substantive rules to define the permissible parameters of the community standard. *Compare Smith v. United States,* 431 U.S. at 302, 97 S.Ct. at 1764 *with Jenkins v. Georgia,* 418 U.S. 153, 160, 94 S.Ct. 2750, 2754, 41 L.Ed.2d 642 (1974). In my view, it is short sighted to attempt to surgically excise the "patently offensive" provision from the statute in an effort to uphold the balance of the Act, particularly in light of the centrality of the provision to the legislative scheme. Absent the statutory guidance of section 18–7–101(4), the substantive delineation of what may be deemed "patently offensive" is left to divergent judicial articulations or the unbridled discretion of a jury in any particular case.

Recognizing the difficulties in engineering an obscenity statute that comports with constitutional requirements, I would never-

theless conclude that the better result in this case is to declare that the infirmities contained in section 18-7-101(4) renders the statute unconstitutional in its entirety.